IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

PAO TMK,

                    Plaintiff,                              Court No. 21-00531

        v.

UNITED STATES OF AMERICA,

                    Defendant.

## COMPLAINT

Plaintiff, PAO TMK ("TMK"), a member of the TMK group companies which produce and export certain seamless steel pipe, by and through its counsel, brings this action against the United States.  Plaintiff alleges and states as follows:

### Introduction

1.      TMK is a leading global manufacturer and supplier of steel pipes for the oil and gas industry and for general use.  TMK is the parent and trading company of the TMK group companies.  TMK group companies operate around the globe through a number of subsidiaries and branches located in the Russian Federation ("Russia"), United States, and other countries in the European and Commonwealth of Independent States territories.  TMK group companies' production lines include drill pipe, oil country tubular goods, line pipe, boiler tube, mechanical pipe, and structural pipe made of carbon, alloy, and stainless steel.

2.      On July 8, 2020, Vallourec Star, LP ("Vallourec"), a U.S. subsidiary of the French multinational Vallourec S.A., filed a petition for the imposition of countervailing duties on imports of seamless carbon and alloy steel standard, line, and pressure pipe ("seamless pipe") from Russia, among other countries.  *See* Letter from Schagrin Associates to Sec'y of the U.S. Department of Commerce, *Petitions for the Imposition of Antidumping and Countervailing*

*Duties: Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Czech Republic, the Republic of Korea, Russia, and Ukraine*, Inv. No. C-821-827 (July 8, 2020) ("Petitions").  Vallourec's petition included allegations concerning Provision of Natural Gas for Less Than Adequate Remuneration and Preferential Loans Provided by State-Controlled Banks. *See* Petitions, Volume III, 5-17.

3.      Vallourec, the sole domestic producer to have filed the Petitions, also imports seamless pipe from several non-subject countries.

4.      Vallourec alleged that the Public Joint Stok Company Gazprom ("Gazprom") provided natural gas at less than adequate remuneration ("LTAR").  Vallourec requested Commerce to measure the adequacy of remuneration of natural gas in Russia by comparing it to prices in the European regional gas market.

5.      Vallourec alleged a nebulous preferential lending program and called it the Preferential Loans Provided by State-Controlled Banks.  *See* Petitions, Volume III, 5-17.  The allegations were that Sberbank, VTB, Gazprombank, and Rosselkhozbank banks were state-controlled, and that those banks provided some unspecified "preferential loans."  As admitted by Vallourec, none of the banks were "policy banks," meaning not designated to implement state policy.  Vallourec's allegation was essentially that because TMK received loans by one or more of the alleged state-owned banks, those loans must have been preferential.

6.      On August 4, 2020, the U.S. Department of Commerce ("Commerce") initiated a countervailing duty ("CVD") investigation into imports of seamless pipe from Russia, among other countries.  *See Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Czech Republic, the Republic of Korea, the Russian Federation, and Ukraine*, 85 Fed. Reg. 47,170 (Dep't of Commerce August 4, 2020) (initiation of countervailing duty investigations).

7.      Commerce preliminarily countervailed provision of natural gas not only by Gazprom but also by Rosneft.

8.      Commerce determined that the provision of natural gas was a specific program because the Russian metals industry, together with oil and agrochemical industries and power generation companies, accounted for a predominant share of gas consumption.

9.      Commerce determined that TMK benefitted from the provision of natural gas by comparing the Russian natural gas prices to European OECD export prices.

10.     Commerce countervailed all loans TMK received not only from the banks in Vallourec's allegations but also from the Russian Regional Development Bank ("RRDB"), whether or not those loans were part of the "preferential lending" program.  Commerce preliminarily calculated a subsidy rate of 0.68 percent for all loans TMK received from those banks.

11.     On June 28, 2021, Commerce issued its final determination.  *See* Memorandum from Melissa Skinner, Senior Director, Office VII, Antidumping and Countervailing Duty Operations, to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, *Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian Federation*, Inv. No. C-821-827 (June 25, 2021) ("Final Decision Memorandum").

12.     Commerce continued to countervail the Provision of Natural Gas at LTAR.

13.     Commerce continued to countervail the Preferential Loans Provided by State-Controlled Banks but applied adverse facts available ("AFA") because of reconciliation issues with TMK's questionnaire responses, selecting a rate of 45.36 percent calculated for the Natural

Gas for LTAR program in another proceeding, the highest calculated rate in any Russian CVD proceeding.  *See* Final Decision Memorandum at 12.

14.     Commerce did not select a lending rate from other Russian CVD proceedings, nor did Commerce corroborate the 45.36 rate.

15.     On August 23, 2021, Commerce published the CVD order on seamless pipe from Russia*.  See Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea and the Russian Federation: Countervailing Duty Orders*, 84 Fed. Reg. 47,060 (Dep't of Commerce August 23, 2021) (countervailing duty order) ("*CVD Order*").

## **<u>Administrative Decision To Be Reviewed</u>**

16.     TMK brings this action to contest certain aspect of the final determination issued by Commerce in its CVD investigation of *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Russia*, Inv. No. C-821-827.  The final determination was published as *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian Federation*, 86 Fed. Reg. 35,263 (Dep't Commerce July 2, 2021) (final affirmative countervailing duty determination) ("Final Determination") and was accompanied by the Memorandum from Melissa Skinner, Senior Director, Office VII, Antidumping and Countervailing Duty Operations, to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, *Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian Federation*, Inv. No. C-821-827 (June 25, 2021).

**Jurisdiction**

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), which confers "exclusive jurisdiction" to the Court over "any civil action commenced under section 516A {} of the Tariff Act of 1930," as amended (the "Act"), *i.e.*, 19 U.S.C. § 1516a. This action is commenced under 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i).

**Standing**

18.     TMK is an exporter and producer of seamless pipe from Russia.  TMK participated in the investigation that is the subject of this action through submission of questionnaire responses and arguments.  TMK is therefore an interested party and party to the proceeding within the meaning of Section 771(9)(A) of the Act, 19 U.S.C. § 1677(9)(A), and has standing to bring this action under 28 U.S.C. § 2631(c) and 19 U.S.C. § 1516a(d).

**Timeliness**

19.     A plaintiff must commence an action under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i) "{w}ithin thirty days after – the date of publication in the Federal Register" of a CVD order based upon final affirmative determination by Commerce under section 1671d.  This action is timely because it is commenced within thirty days of August 23, 2021, the date of publication of the *CVD Order*, by filing the summons with the clerk of the court on September 21, 2021, followed by this complaint within 30 days of the filing of the summons.

**Background**

20.     Paragraphs 1 to 19 are incorporated herein by reference.

21.     On August 13, 2020, Commerce selected TMK and TMK VOLZHSKY as mandatory respondents because they were the top two exporters or producers by the volume of

seamless pipe from Russia that entered for consumption into the United States during the period

of investigation.  *See* Memorandum from Melissa G. Skinner, Senior Director, Office VII,

Antidumping and Countervailing Duty Operations, to James Maeder, Deputy Assistant Secretary

for Antidumping and Countervailing Duty Operations, *Countervailing Duty Investigation of*

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian*

*Federation: Respondent Selection*, Inv. No. C-821-827 (Aug. 13, 2020).

22.     On August 17, 2020, Commerce issued a 119-page initial questionnaire and

various data file templates to the Government of Russia ("GOR") and mandatory respondents.

*See* Letter from Commerce to the Embassy of the Russian Federation, *Countervailing Duty*

*Investigation of Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the*

*Russian Federation: Countervailing Duty Questionnaire*, Inv. No. C-821-827 (Aug. 17, 2020).

23.     On August 30, 2020, TMK provided questionnaire responses concerning

affiliations, reporting that certain cross-owned companies, including Volzhsky Pipe Plant Joint

Stock Company (*i.e.* TMK VOLZHSKY), will be responding to Commerce's questionnaires.

*See* Letter from Crowell & Moring LLP to Sec'y of Commerce, *Seamless Carbon and Alloy*

*Steel Standard, Line, and Pressure Pipe ("SSLP Pipe") from Russia: TMK Affiliate*

*Questionnaire Response*, Inv. No. C-821-827 (Aug. 31, 2020).

24.     On October 5, 2020, TMK filed its initial questionnaire responses.  *See* Letter

from Crowell & Moring LLP to Sec'y of Commerce, *Seamless Carbon and Alloy Steel Standard,*

*Line, and Pressure Pipe (''SSLP Pipe'') from Russia: TMK Section III Response*, Inv. No. C-

821-827 (Oct. 5, 2020).  TMK reported that it did not receive loans under any "preferential"

lending programs.  *Id.* at 17-32.  Concerning the Provision of Natural Gas for LTAR, TMK

reported that industrial users can purchase natural gas from Gazprom at regulated prices, from

independent gas producers, or from the stock exchange.  *Id.* at 12.  Gazprom prices for natural gas, transmission, and supply services are regulated by the Federal Antimonopoly Services and are set according to tariff schedules.  *Id.* at 12-15.

25.     On October 6, 2020, the GOR filed its initial questionnaire responses.  *See* Letter from the Min. of Econ. Dev. of the Rus. Fed. to Sec'y of Commerce, *Carbon and Alloy Seamless, Standard, Line and Pressure Pipe from the Russian Federation: Questionnaire Response of the Ministry of Economic Development of the Russian Federation*, Inv. No. C-821-827 (Oct 6, 2020).

26.     The GOR submitted that neither of the alleged state-controlled banks (*i.e.* Sberbank, VTB, Gazprombank, and Rosselkhozbank) had any information concerning a preferential lending program for the steel pipe industry.  *Id.* at 61-63.

27.     Concerning the Provision of Natural Gas for LTAR, the GOR reported that "{a}s of January 1, 2019, natural gas in Russia was produced by 252 companies, including 104 organizations included in the structure of vertically integrated holdings, 145 independent oil and gas companies, {and three companies operating under production sharing agreements}." *Id* at 12.

28.     The GOR reported that regulated "wholesale gas prices do not apply to … {g}as produced and sold by gas producers, which are independent of PJSC Gazprom."  *Id.* at 19.  Not once did Commerce mention the name "Rosneft" in its questionnaire.

29.     Concerning Gazprom, the GOR reported that consistent with the findings in the Report of the Working Party on the Accession of the Russian Federation to the World Trade Organization, the GOR policy is to ensure that Gazprom recovers its costs and makes profit for the supply to the industrial users.  *Id.* at 11.

30.     On November 9, 2020, Vallourec submitted benchmark data for Commerce to measure adequacy of remuneration for the provision of natural gas.  *See* Letter from Schagrin and Associates to Sec'y of Commerce, *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Russia: Benchmark Submission*, Inv. No. C-821-827 (Nov. 9, 2020).  Vallourec submitted UN Comtrade natural gas export data for 2019 and a 2018 European Commission Report concerning transmission and distribution costs for natural gas in Europe based on a sampled data covering 2008 to 2017 years.

31.     On November 10, 2020, TMK submitted natural gas benchmark data.  Letter from Crowell & Moring LLP to Sec'y of Commerce, *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe ("SSLP Pipe") from Russia: TMK Benchmark Data Letter*, Inv. No. C-821-827 (Nov. 9, 2020).  TMK provided Novatek's, an independent natural gas producer in Russia, 2019 Annual Report which included gas prices in 2019.  TMK also provided International Gas Union's 2020 Wholesale Gas Prices survey, based on 2019 data, which explained different global price formation mechanisms and included gas prices from around the world.

32.     On November 19, 2020, TMK submitted additional benchmark data in rebuttal to Vallourec's benchmark submission.  Letter from Crowell & Moring LLP to Sec'y of Commerce, *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe ("SSLP Pipe") from Russia: TMK Rebuttal to Vallourec Benchmark*, Inv. No. C-821-827 (Nov. 19, 2020).  TMK provided a study on the Russian natural gas market by the Brattle Group (the "Report").

33.     The Report provided a market principles analysis based on Gazprom's costs of production, operations, and transportation to certain industrial users and return on assets.  The

Report found that Gazprom prices exceeded its costs by between 2.82 to 5.22 percent. *Id.* at Appendix 1, p.25.

34.     The Report analyzed whether Gazprom's majority market share distorted the Russian private natural gas market, finding that the market for industrial users remained competitive. *Id.* at Appendix 1, pp.1-9.

35.     The Report cautioned against the comparison of European market prices to prices in Russia because Gazprom's production costs were relatively lower and because of the physical impossibility of natural gas flowing from Europe to Russia along the three main pipelines *Id.* at Appendix 1, pp.vi,14.  The direction of flow of gas is towards Europe.

36.     On November 27, 2020, Commerce placed on the record of the investigation natural gas prices for OECD countries in 2019, published by the International Energy Agency. *See* Memorandum to the File from Caitlin Monks, Senior International Trade Compliance Analyst, AD/CVD Operations, Office VII, *Countervailing Duty Investigation of Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian Federation: Placing Benchmark Data on the Record*, Inv. No. C-821-827 (Nov. 27, 2020).

37.     Between November 23, 2020, and February 2, 2021, TMK and GOC filed responses to Commerce's various supplemental questionnaires.

38.     On December 8, 2020, Commerce issued its preliminary determination and initiated investigation of certain new subsidy allegations filed by Vallourec on October 8, 2020. *See Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian Federation: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 Fed. Reg. 80,007 (Dep't Commerce December 11, 2020), and accompanying Memorandum from James Maeder, Deputy

Assistant Secretary for Antidumping and Countervailing Duty Operations, to Jeffrey I. Kessler,

Assistant Secretary for Enforcement and Compliance, *Decision Memorandum for the Affirmative*

*Preliminary Determination in the Countervailing Duty Investigation of Seamless Carbon and*

*Alloy Steel Standard, Line, and Pressure Pipe from the Russian Federation Preliminary Decision*

*Memorandum*, Inv. No. C-821-827 (Dec. 8, 2020) ("Preliminary Decision Memorandum").

39.     Commerce preliminarily countervailed provision of natural gas not only by

Gazprom but also by Rosneft Oil Company PJSC, Rosneftegaz JSC and Uralsevergas

(collectively, "Rosneft").

40.     Commerce found that the provision of natural gas was not *de jure* specific to the

seamless pipe industry.

41.     Commerce concluded that the metallurgical industry was a predominant user of

natural gas together with agrochemical and utilities/power generation companies because they

accounted for "around 80% of Russia's total gas consumption."  *See* Preliminary Decision

Memorandum at 16.  Commerce thus found that the provision of natural gas was *de facto*

specific under Section 771(5A)(D)(iii)(II) of the Act, *i.e.*, 19 U.S.C. § 1677(5A)(D)(iii)(II).

42.     Commerce determined that the private market for natural gas in Russia was

distorted because of the combined Gazprom's (subject to the regulated prices) and Rosneft's

(neither subject to regulated prices nor alleged to have provided subsidies) market shares and

import and export tariffs on natural gas.

43.     As a benchmark for natural gas prices, Commerce relied on the European OECD

export prices it had placed on the record.  Commerce also confirmed that the gas pipelines from

Europe and Asia were not bi-directional, excluding the possibility of gas supply into Russia.

44.    Concerning the "preferential lending program," Commerce preliminarily determined that Sberbank, VTB, the Russian Agricultural Bank, Gazprombank, and RRDB, which was not part of Vallourec's allegations, were authorities.  Because the GOR failed to provide answers concerning the undefined "preferential lending program," Commerce applied AFA that the program was specific to the metals industry and "prestige infrastructure projects."

45.    Commerce made no findings that TMK's loans from those financial institutions were obtained under the so-called "preferential lending program."  Instead, ignoring loan application and approval documents demonstrating otherwise, Commerce preliminarily calculated a subsidy rate of 0.68 percent for all loans from those institutions.

46.    On March 9, 2021, Commerce issued a questionnaire in lieu of verification to TMK.  On April 8, 2021, TMK responded to this questionnaire.  *See* Letter from Crowell & Moring LLP to Sec'y of Commerce, *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe ("SSLP Pipe") from Russia: TMK In-Lieu of Verification Questionnaire Response*, Inv. No. C-821-827 (Apr. 7, 2021).

47.    Between April 27 and May 4, 2021, parties filed case and rebuttal briefs.

48.    On July 2, 2021, Commerce published its final determination.  *See* Final Determination, accompanied by Final Decision Memorandum.

49.    Commerce continued to find that the Provision of Natural Gas by Gazprom and Rosneft is specific because Commerce's designated group of industries, including metals, oil, and agrochemical industries, accounted for a predominant share of gas consumption.  Commerce ignored that the seamless pipe industry constituted only a portion of the metals industry, which in turn accounted for 6 percent of Gazprom's sales.  *See* Final Decision Memorandum at Comment 3c.

50.     Commerce continued to reject the preferred "Tier One" benchmark, finding that the private natural gas market in Russia was distorted.  *See* Final Decision Memorandum at Comment 3d.

51.     Commerce's regulations provide a three-tier hierarchy of benchmarks to measure the adequacy of remuneration.  *See* 19 C.F.R. 351.511(a)(2)(i)-(iii).  The preferred, "Tier One," benchmark is a market-determined price "resulting from actual transactions in the country in question."  If such prices are not available, as a "Tier Two" benchmark, Commerce uses world market prices "where it is reasonable to conclude that such price would be available to purchasers in the country in question."  If world market prices are not available, Commerce measures adequacy of remuneration by assessing whether "the government price is consistent with market principles" – *i.e.* "Tier Three" benchmark.

52.     When relying on a Tier Three benchmark, Commerce conducts a market principles analysis which considers the following factors: "the government's price setting philosophy, costs (including rate of return sufficient to ensure future operations), and possible price discriminations."  *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (November 25, 1998) (final rules) ("*CVD Preamble*").

53.     Neither in its preliminary nor in its final determination did Commerce conduct a market principles analysis after disposing of the in-country private gas prices and word market prices.  Instead, Commerce relied on the European OECD export prices as a Tier Three benchmark.  Commerce's only explanation for abandoning the market principles analysis was that despite the *CVD Preamble* stating otherwise, "the regulations do not prescribe any specific analysis under this prong."  *See* Final Decision Memorandum at Comment 3f.

54.     Commerce applied total AFA to the Preferential Loans Provided by State-Controlled Banks and substituted the preliminary calculated lending subsidy rate of 0.68 percent with a 45.36 percent rate calculated for the Natural Gas for LTAR program in another proceeding, the highest calculated rate in any Russian CVD proceeding.  *See* Final Decision Memorandum at 12.

55.     Commerce did not select a lending rate from other Russian CVD proceedings, nor did Commerce corroborate the 45.36 rate.

56.     Commerce continued to find that Sberbank is an "authority" without any explanation other than ownership by Bank of Russia.  Nor did Commerce provide any analysis that the RRDB is an authority other than pointing to the ownership by Rosneft.  *Id.* at Comment 4a.

57.     On July 6, 2021, TMK filed final ministerial error comments to alert Commerce that the volume of a certain purchase of natural gas was 1,000 time less because the volume was reported with a comma, which in Russia, and most other countries, is used to denote a decimal place.  *See* Letter from Crowell & Moring LLP to Sec'y of Commerce, *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe ("SSLP Pipe") from Russia: TMK Ministerial Error Comments on Final Determination*, Inv. No. C-821-827 (July 6, 2021).

58.     Correction of this error would change the subsidy rate for the Natural Gas for LTAR program from 2.49 to 2.43 percent.

59.     On July 21, 2021, Commerce responded to ministerial error comments and declined to correct the volume of the reported purchase of natural gas because "the record lacks any clear indication that the correct volume for the transaction should be" the lesser amount.  *See* Memorandum from Caitlin Monks, Senior International Trade Analyst, Office VII, Antidumping

and Countervailing Duty Operations, to Melissa G. Skinner, Senior Director, Office VII,

Antidumping and Countervailing Duty Operations, *Countervailing Duty Investigation of*

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian*

*Federation: Response to Ministerial Error Comments in the Final Determination*, Inv. No. C-

821-827 (July 21, 2021) at 5-6.

## STATEMENT OF CLAIMS

### Count One

60.     Paragraphs 1 to 59 are incorporated herein by reference.

61.     Seamless pipe industry is part of the broader metals industry.

62.     The metals industry accounted for six percent of natural gas consumption.

63.     Commerce arbitrarily "grouped" unrelated metals, oil, and agrochemical industries to find that the group accounts for a predominant share.

64.     Commerce provided no explanation how those unrelated industries constitute a "group" within the meaning of Section 771(5A) of the Act, *i.e.*, 19 U.S.C. § 1677(5A)(D)(iii)(II).

65.     Thus, Commerce's determination that the provision of natural gas was specific to "predominant" users in the metals and metallurgy industry is arbitrary, unlawful, and not supported by substantial evidence.

### Count Two

66.     Paragraphs 1 to 65 are incorporated herein by reference.

67.     Commerce found that the private market prices were distorted by combining market shares of Gazprom and Rosneft.

68.     Gazprom's prices are regulated by the Federal Antimonopoly Service.

69.     Rosneft's prices are not subject to price regulations by the government.

70.     Rosneft's market share has no added effect on the alleged market distortions by Gazprom's prices set by regulations.  To the contrary, Rosneft's market share reduces any influence Gazprom's regulated prices have on the market.

71.     Thus, Commerce's decision to combine market shares of Rosneft and Gazprom to determine whether private market prices were distorted by the regulated prices is arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law.

**Count Three**

72.     Paragraphs 1 to 71 are incorporated herein by reference.

73.     Commerce found that the private market prices and stock exchange prices were distorted because of the state-owned suppliers' market shares and government controls on imports and exports of natural gas.  Commerce also stated that "Gazprom holds the exclusive rights to transport and export natural gas via pipeline." *See* Final Decision Memorandum at 41.

74.     The *CVD Preamble* requires a finding that "actual transaction prices are significantly distorted as a result of the government's involvement in the market."  63 Fed. Reg. at 65,377.

75.     Commerce conceded that "{t}he fact that the government is a significant supplier of goods does not, in itself, establish that all prices for the goods are distorted." *See* Final Decision Memorandum at 40.

76.     Commerce did not explain how Gazprom's or Rosneft's prices distorted the private market.  Commerce only provided a conclusory statement that "the GOR through Gazprom and Rosneft has sufficient market power to effectively determine the prices of private suppliers of natural gas in Russia." *See* Final Decision Memorandum at 40.

77.     Neither did Commerce explain how Gazprom's exclusive rights to transport natural gas and import and export tariffs on natural gas lead to market distortion.

78.     Thus, Commerce's determination that the Russian private natural gas market is significantly distorted is arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law.

### Count Four

79.     Paragraphs 1 to 78 are incorporated herein by reference.

80.     Commerce failed to conduct a "Tier Three" market principles analysis of the allegedly subsidized provision of natural gas.

81.     Commerce's regulations and the *CVD Preamble* require conducting a market principles analysis under the Tier Three benchmarking hierarchy.  *See* 19 C.F.R. 351.511(a)(2)(iii); *see also CVD Preamble*, 63 Fed. Reg. at 65,378.

82.     Instead, Commerce resorted to a "Tier Two," world market prices, benchmark cloaked as Tier Three.

83.     Commerce's failure to conduct a market principles analysis is not in accordance with law.

### Count Five

84.     Paragraphs 1 to 83 are incorporated herein by reference.

85.     Commerce refused to correct the volume of purchased natural gas to account for the difference in the use of a dot in the United States and a comma in Russia to denote a decimal place.

86.     Commerce's explanation for its refusal was that the record lacks any clear indication that the correct volume should be the lesser amount.

87.     By the same logic, the record lacks any clear indication that the correct volume should be the higher amount.

88.     A simple comparison of the reported values corresponding to the purchased volumes demonstrates that the reasonable conclusion would have been that the lesser quantity is accurate.

89.     Thus, Commerce's explanation for not making the correction to accurately account for the reported purchase of natural gas is not supported by substantial evidence.

## Count Six

90.     Paragraphs 1 to 89 are incorporated herein by reference.

91.     Commerce failed to corroborate its selection of the 45.36 percent rate as an AFA rate for preferential lending.

92.     According to Section 776(c) of the Act, *i.e.*, 19 U.S.C. 1677e(c), information not obtained during the course of an investigation must be corroborated.

93.     This AFA rate was based on another Russian CVD proceeding.

94.     Thus, Commerce's failure to corroborate the 45.36 percent AFA rate was not in accordance with law.

## Count Seven

95.     Paragraphs 1 to 95 are incorporated herein by reference.

96.     Pursuant to Section 776(d) of the Act, *i.e.*, 19 U.S.C. 1677e(d), when selecting an AFA subsidy rate, Commerce may not select any other countervailable subsidy rate when it had applied a subsidy rate for the same or similar program in a CVD proceeding involving the same country.

97.     Commerce stated that there are no comparable programs in any previous Russian CVD proceeding that resulted in an above-*de minimis* rate.

98.     However, Commerce calculated a subsidy rate of 0.07 percent for the Preferential Debt Financing of Project Aimed at Introducing Best Available Technologies in the CVD investigation of *Phosphate Fertilizers from Russia.  See Phosphate Fertilizers from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce February 16, 2021), and accompanying Memorandum from James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to Christian Marsh, Acting Assistant Secretary for Enforcement and Compliance, *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation*, Inv. No. C-821-825 (Feb. 9, 2021) at 10.

99.     The two programs, Preferential Debt Financing of Project Aimed at Introducing Best Available Technologies and the alleged Preferential Loans Provided by State-Controlled Banks, are similar because they are both preferential lending programs.

100.    Thus, Commerce's explanation that there are no comparable programs and the resulting selection of the 46.36 percent AFA rate are unsupported by substantial evidence and not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, TMK respectfully requests that this Court:

1. Hold that the Final Determination is unsupported by substantial evidence and not in accordance with law.

2. Remand the Final Determination to Commerce with instructions to issue a new determination consistent with the Court's opinion.

3.  Provide such other relief as this Court may deem just and proper.


Respectfully submitted,


Dated:  October 21, 2021

Daniel Cannistra
John Anwesen

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Tel: 202.624.2902
E-mail: DCannistra@crowell.com